## DEARBORN PUB. CO. v. FITZGERALD, Mayor, et al.

(District Court, N. D. Ohio, E. D.    April 16, 1921.)

No. 621.

1. **Injunction ☞105(1)—Unfounded criminal prosecution restrained, to prevent multiplicity of suits and irreparable injury.**

A continuing course of conduct in instituting prosecutions, not supported by a valid constitutional law or ordinance, or in excess of authority conferred by any valid law or ordinance can be enjoined, to prevent the multiplicity of actions, which would be necessary to redress the continuing wrongs, and to prevent irreparable injury by the infliction of damages not susceptible of accurate ascertainment at law.

2. **States ☞191(2)—United States ☞125—Suit to restrain unauthorized prosecution held not suit against state or United States.**

Institution of prosecutions, unsupported by a valid constitutional law, or in excess of authority conferred by law, by either a federal, state, or municipal officer, is regarded as in excess of the authority vested in the officer, so that a suit to restrain such a prosecution is not a suit against the United States or a state.

3. **Libel and slander ☞146—Obscenity ☞7—Publication of article attacking Jews is not obscene or scandalous.**

A publication of articles in a paper, attacking the Jews as a race, is not indecent, obscene, or scandalous, within a city ordinance prohibiting the offering for sale of a publication containing indecent, obscene, or scandalous articles.

4. **Municipal corporations ☞622—City cannot forbid in advance sale of publication because of prohibited articles.**

The limit of a city's power to enforce an ordinance prohibiting the sale of obscene or scandalous publication is to conduct a prosecution for the specific offense thus committed. It cannot, by establishment of a censorship in advance of future publications, prohibit generally the sale thereof upon the streets.

5. **Newspapers ☞6½—Sale of paper attacking Jews cannot be prohibited, to prevent breaches of the peace.**

The sale of a newspaper containing articles attacking the Jews as a race cannot be prohibited on the streets of a city, under an ordinance forbidding the sale of publications tending to promote breaches of the

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

peace, since it cannot be assumed that members of that race will resort to violence to stop the sale, or that others will be thereby incited to commit violence against the Jews.

**6. Constitutional law** ⟐**90—Prohibiting sale of paper attacking race violates freedom of the press.**

    The action of the city officials in prohibiting the sale on city streets of newspapers containing articles attacking the Jewish race, because of disapproval of those articles, is a violation of the right of the freedom of the press.

In Equity. Suit by the Dearborn Publishing Company against W. S. Fitzgerald, individually and as Mayor of the City of Cleveland, and others. On plaintiff's motion for preliminary injunction, and defendants' motion to dismiss the bill for lack of jurisdiction and want of equity. Preliminary injunction granted.

Squire, Sanders & Dempsey, of Cleveland, Ohio (William Lucking, of Detroit, Mich., of counsel), for plaintiff.

William B. Woods, Director of Law, of Cleveland, Ohio, for defendants.

WESTENHAVER, District Judge. This cause has been heard and submitted upon plaintiff's motion for a preliminary injunction, and upon defendants' motion to dismiss the bill for lack of jurisdiction and want of equity. The motion for a preliminary injunction was heard upon affidavits. The facts essential to a decision of the questions involved are not in dispute, and both motions can be disposed of together.

Plaintiff publishes a weekly newspaper called the Dearborn Independent. On and prior to March 14, 1921, copies of this newspaper were sold by venders upon the streets of Cleveland in the same manner as are sold local and other daily and weekly newspapers. On this date, four persons thus employed were arrested by order of the defendant Frank Smith, chief of police, acting under the express direction of the other two defendants. They were, after their arrest, charged by warrant and are now held for trial upon a criminal charge of offering for sale a certain indecent and scandalous publication, to wit, the Dearborn Independent; the same being calculated to excite scandal and having a tendency to create breaches of the peace, in violation of section 1770, Rev. Ord. of the City of Cleveland. A copy of the issue of March 12, 1921, was attached to and made a part of the warrant, and is now exhibited with the bill. The article therein, upon which the warrant is based, is found on pages 8 and 9, and is entitled "Jewish Rights Clash with American Rights." No trial has yet been had of these criminal charges.

Immediately thereafter, and upon application of plaintiff's representatives to defendants, they were notified by the latter that no further sales of the Dearborn Independent would be permitted upon the streets of Cleveland; that, if such sales were attempted at any time, the persons so attempting would be immediately arrested; that such sales would be regarded as unlawful and contrary to the ordinance above referred to, but that no objection to such sales would be made if the so-called anti-Semitic or anti-Jewish articles appearing therein

were omitted. Its sale at news stands and in shops, however, was not forbidden, and has not been interfered with. Upon this hearing the defendants do not deny these allegations. The affidavit of Mayor Fitzgerald, the only one filed on behalf of defendants, admits their substantial accuracy, and attempts only to justify such action on the ground that these articles would tend to create religious and racial dissensions, and have a tendency to create breaches of the peace. As a result, plaintiff's publication has been excluded from sale by news venders on the city streets, and its circulation reduced approximately three-fourths.

The article in the issue of March 12 has been examined. Earlier issues have not been exhibited or offered in evidence, but it may be assumed that they are of the same general type, and equally vicious or equally harmless, according to the personal views of the reader. An examination of the evidence convinces me that defendants' action was taken with the intent and purpose of preventing sales of the plaintiff's newspaper on the streets only because it contained these articles; that such action was not with a view to preventing the sale of indecent, obscene, or scandalous publications, the sale of which is forbidden by section 1770; that such action was not directed towards preserving the public peace of the city, and was not in any wise necessary to prevent any breach of the peace. The necessary effect of such action is to censor in advance the contents of the newspaper, by preventing its sale in the same manner as all other newspapers are sold, so long as it contains articles of like character. The questions of law are whether this action is without valid legal support, and, if so, whether a court of equity has jurisdiction by injunction to prevent it.

[1] Defendants' motion to dismiss raises several objections to the granting of relief, of which, however, it is necessary to consider separately only the objection that a court of equity cannot take jurisdiction, because so to do would be to enjoin the prosecution of a criminal action. This objection is without merit. Plaintiff disclaims any desire to enjoin the prosecution of the pending charges. If the only injury complained of was the further prosecution of those charges, plaintiff's remedy at law by a defense thereto might be regarded as adequate. Defendants' action, however, prevents other sales from time to time and from week to week. This is a continuing course of conduct, and, if not supported by a valid constitutional law, or is in excess of authority conferred on them by any valid law or ordinance, becomes a continuing and repeated wrong. In this situation a court of equity has from time immemorial granted relief upon two well-established principles. One is the multiplicity of actions which would be necessary to redress a continuing and repeated wrong; and the other is the irreparable nature of the injury inflicted, in that the damage is not susceptible of accurate ascertainment at law.

[2] This case is well within the numerous decisions sustaining the jurisdiction of a court of equity to grant relief upon either the one or the other of these principles, notwithstanding it may be necessary to enjoin pending or threatened criminal prosecutions under unconstitutional or invalid statutes or ordinances. In such cases the actions

of federal, state, or municipal officials are regarded as being in excess of any lawful power or authority vested in them, and suits against them are not regarded as suits against a state, or to restrain the prosecution of suits in a state court. See Ex parte Young, 209 U. S. 155, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764; Philadelphia Co. v. Stimson, 223 U. S. 605, 32 Sup. Ct. 340, 56 L. Ed. 570; Truax v. Raich, 239 U. S. 33, 36 Sup. Ct. 7, 60 L. Ed. 131, L. R. A. 1916D, 545, Ann. Cas. 1917B, 283; C. A. Weed & Co. v. Lockwood (2 C. C. A.) 266 Fed. 785; Star Co. v. Brush, 185 App. Div. 261, 172 N. Y. Supp. 851.

The case last cited sustains the jurisdiction of a court of equity, and adjudges the actions of a city, precisely like that here complained of, to be illegal. Judge Manton's opinion in the Weed Case is clearly my understanding of the law applicable to suits in equity to enjoin federal, state, and city officials, when acting under invalid statutes or ordinances, or in excess of any lawful power vested in them. The judgment in this case was reversed by the United States Supreme Court only because it held the act of Congress, popularly known as the Lever Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115⅛e–3115⅛kk, 3115⅛l–3115⅛r), to be constitutional; but the law of it was approved, so far as it relates to the powers of a court of equity. See opinion of Chief Justice White, filed February 28, 1921.

Arbuckle v. Blackburn (6 C. C. A.) 113 Fed. 616, 51 C. C. A. 122, 65 L. R. A. 864, much relied on by defendants, is authority only for the proposition that, if an indictment is found under a constitutional statute, a court of equity will not try the issue of the defendant's guilt or innocence as a condition upon which to grant equitable relief by injunction.

Upon the merits, plaintiff plainly is entitled to relief. Two grounds of relief are urged, with respect to which no opinion need be expressed. One is that its method of selling its publication by agents employed by it upon the city streets of Cleveland is interstate commerce, with which defendants have no right to interfere. Another is that section 1770, Rev. Ord. of the City of Cleveland, is invalid, because not within the legislative power delegated by statute to cities of Ohio at the time it was enacted, and that, being invalid when enacted for want of such power, it is not made valid by that provision of the Home Rule Charter of the city of Cleveland continuing in force all existing ordinances. A decision of these two contentions is not necessary to a decision of this case.

[3, 4] Section 1770, if valid and in force, does not authorize or justify defendants' conduct. The publication complained of cannot by any stretch of the imagination be classified as indecent, obscene, or scandalous; but, if it were, the limit of the city's power would be to conduct a prosecution for the specific offense thus committed, and not the establishment of a censorship in advance of future publications, and prohibition generally of the sale thereof upon the streets, in the same manner as other publications may be sold. That the real basis of defendants' action is not the indecent, obscene, or scandalous character of the publication is further evidenced by their action in

permitting its sale at news stands or in shops, without any effort to prosecute therefor; whereas, under section 1770, it would be as much an offense to sell at a news stand or in a shop an indecent, obscene, or scandalous publication as it is to sell it upon the city streets.

[5] That the publication has a tendency to create breaches of the peace is equally without foundation in fact or in law. Assuming that section 1770 is sufficiently definite in this respect to be valid—an assumption which may well be doubted, in view of the adjudged cases (see U. S. v. L. Cohen Grocery Co., 254 U. S. ——, 41 Sup. Ct. 298, 65 L. Ed. ——, decided February 28, 1921, by the United States Supreme Court, holding the act of Congress popularly known as the Lever Act unconstitutional for indefiniteness; Froehlich v. City of Cleveland, 99 Ohio St. 376, 391, 124 N. E. 212)—its language was never intended to apply to a newspaper article of the kind in question. The affidavits conclusively show that no disorder or excitement was created on the streets by the sales in question. Nothing appears to indicate who were or might be excited by its sale to break the peace. It would be a libel, it seems to me, on people of the Jewish race to assume that they are imbued with such a spirit of lawlessness. If it be assumed that the article might tend to excite others to breaches of the peace against people of the Jewish race, the reply is plain. It is the duty of all officials charged with preserving the peace to suppress firmly and promptly all persons guilty of disturbing it, and not to forbid innocent persons to exercise their lawful and equal rights.

The principles of law involved are not only familiar, but have been set forth and applied in two situations so parallel upon the facts that a restatement or re-examination of the law becomes unnecessary. One line of cases arose as a result of certain efforts to suppress the public exhibition of the photoplay called "The Birth of a Nation." In the efforts to suppress that exhibition in Cleveland, section 1770 was invoked by the city officials as the source of their power, and it was urged that if the photoplay were exhibited it would have a tendency to create, and would probably result in, a serious breach of the peace, and that certain scenes in it were calculated to cast disgrace upon a large body of self-respecting and law-abiding citizens of the city. In point of fact, a part of the population of the United States, aggregating some 10,000,000, had the right to urge the same objections against the exhibition of that photoplay as any part of the population has to urge the objections now made against the so-called anti-Jewish articles in plaintiff's newspaper. In Epoch Producing Co. v. Davis, 19 Ohio N. P. (N. S.) 465, Judge Foran awarded an injunction restraining the city officials from prohibiting or interfering with the public exhibition of "The Birth of a Nation." In so doing, he deals specially with the contention that its exhibition might tend to create breaches of the peace, and makes use of language applicable to the present situation, to which nothing need or can be profitably added. He says (19 Ohio N. P. [N. S.] 475, 476):

"Will the exhibition of this photoplay have a tendency to provoke a breach of the peace? Certainly, so far as law-abiding citizens are concerned, such a

tendency does not exist and cannot be seen. * * * To admit that this photoplay tends to provoke a breach of the peace is to confess that citizens of African descent are not law-abiding citizens. This I am not willing to admit, as it would be an uncalled-for slander upon these citizens. A 'tendency to provoke a breach of the peace' does not mean a manufactured tendency; but it rather means, as applied in this instance, something the natural effect and tendency of which would be to unconsciously and spontaneously cause men to lose control of their reason and permit passion and anger to dominate judgment."

In numerous cases similar rulings were made, and all the courts, state and federal, when called on, issued without hesitation injunctions restraining public officials from forbidding the exhibition of this photoplay. In some cases relief was granted on the ground that the action of the city officials was in violation of the rights of free speech and a free press.

The other line of cases is an exact counterpart of the instant case. They involved efforts of city officials by ordinance to forbid the circulation and sale of particular newspapers. In Ex parte Neill, 32 Tex. Cr. R. 275, 22 S. W. 923, 40 Am. St. Rep. 776, the ordinance under review had declared a specific newspaper to be a public nuisance and forbade its sale on the streets of the city. It was held that the ordinance was invalid because it violated that provision of the Texas Bill of Rights which is precisely the same as section 11, art. 1, of the Constitution of Ohio, which is in these words:

"Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press."

In New York, the council of the city of Mt. Vernon passed an ordinance forbidding the circulation and sale within its city limits during the period of the war of the New York American and the New York Journal. This ordinance was held invalid, and a preliminary injunction awarded against its enforcement, by Judge Geigerich. See Star Co. v. Brush, 103 Misc. Rep. 631, 170 N. Y. Supp. 987. On appeal his judgment was affirmed by the Appellate Division, in an opinion which sustains broadly the jurisdiction of a court of equity to grant relief by injunction, and holds the ordinance to be an invasion of the constitutional right of a free press. See Star Co. v. Brush, 185 App. Div. 261, 172 N. Y. Supp. 851. Still another ordinance, apparently later in date, was adopted by the council of Mt. Vernon, which forbade the sale of newspapers upon the streets without first applying for and obtaining a license or permit, which license was subject to revocation. This ordinance was likewise held to be invalid, and its enforcement enjoined because it violated the constitutional guaranty of a free press, and Judge Geigerich, in delivering the opinion, says in effect that the ordinance, if valid, would permit the public authorities to suppress the circulation of any newspaper the views of which they disapproved, by revoking the license or permit, while at the same time permitting the free circulation without molestation, of other newspapers the views of which they approved. See Star Co. v. Brush, 104 Misc. Rep. 404, 172 N. Y. Supp. 320. Either the same or another ordinance of this city forbade the circulation and sale

of all newspapers and publications which had been or hereafter may be printed in the German language, as being deemed harmful to the best interests of the nation in the prosecution of the war, and this ordinance also was held to be invalid and its enforcement enjoined at the suit of the New Yorker Staats Zeitung and the German Herold Publishing Company. See 170 N. Y. Supp. 993.

[6] The propositions of law, as has been already said, upon which these several decisions are based, are so familiar and well established that further discussion is unnecessary. The action of the city officials, be it said with due respect, is not an effort to enforce valid provisions of section 1770. It is action under color of that section, and by virtue of official station to accomplish another and different purpose. That purpose, as has already been stated, is to prevent the sale upon equal terms and under the same conditions as the right of sale is accorded to all other newspapers, because plaintiff's newspaper contained a certain article which does not meet with the approval of the city officials. That such action is taken in good faith and under a belief that the article in question tends to create religious and racial dissensions may be conceded, but the law in all its long history supplies no instance in which either a race or a religion won the approval and disarmed the prejudice of another people by forbidding the latter to write and speak their minds freely. Be this, however, as it may, there is in law no more justification for prohibiting its sale upon the streets than there would be to prohibit the sale of any Cleveland newspaper whose political views and personal attitude on other questions met with their disapproval. If defendants' action were sustained, the constitutional liberty of every citizen freely to speak, write, and publish his sentiments on all subjects, being responsible only for the abuse of that right, would be placed at the mercy of every public official who for the moment was clothed with authority to preserve the public peace, and the right to a free press would likewise be destroyed.

No support for defendants' action can be found in the Espionage Law (40 Stat. 217), or in the decisions which have sustained its constitutionality. That law was passed by a sovereign power, clothed with all the war powers enjoyed by any sovereign power. That law makes it an offense to do certain things only while the United States is at war. Most of the cases have arisen under its provisions, which forbid acts or attempts, including written or spoken words, to cause insubordination, disloyalty, or refusal of duty in the military or naval forces of the United States, or to obstruct the recruiting or enlistment service of the United States. In administering this law, the courts have uniformly held that the written or spoken words must be published or uttered with the specific intent thus forbidden, and must also be of such a nature as is reasonably calculated to cause or produce the forbidden results, and upon these questions the right of trial by jury was accorded. That this law was not a violation of either the constitutional right to free speech or to a free press was held in numerous decisions upon reasoning so sound as not to admit of differences of opinion among persons learned in the law. See Schenck v. U.

S., 249 U. S. 47, 39 Sup. Ct. 247, 63 L. Ed. 470; Debs v. U. S., 249 U. S. 211, 39 Sup. Ct. 252, 36 L. Ed. 566.

A preliminary injunction will be granted as prayed. Bond is required in the penalty of $5,000, with security to be approved by the clerk, conditioned to pay all damages that may be sustained by any one, and all costs that may be awarded in the event this preliminary injunction shall hereafter be dissolved.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes