Fuld, J.
Although we are all agreed for affirmance, we reach that conclusion by somewhat different routes. The importance and perplexities of the constitutional issue presented persuade me that there must be more full discussion than some of my associates believe necessary of the reasons for and the reach of the decision being made.
Enacted in 1941 (L. 1941, ch. 925) and amended in 1954 (L. 1954, ch. 702), section 22-a of the Code of Criminal Procedure was designed to supplement existing criminal sanctions by providing an additional civil remedy in the Supreme Court, by way of an action for an injunction, against the sale and distribution of written or printed matter found, after trial, to be obscene. Modeled on the language of section 1141 of the Penal Law, the statute prohibiting the sale and distribution of items obscene, section 22-a, insofar as here pertinent, embraces ‘ ‘ any book, magazine, pamphlet, comic book, story paper, writing, paper, picture, drawing, photograph, figure, image or any written or printed matter of an indecent character, which is obscene, lewd, lascivious, filthy, indecent or disgusting ”. It vests the right to maintain the action in the chief executive or legal officer of any city, toAvn or village and provides that it may be brought against anyone who ‘ ‘ sells or distributes or is about to sell or distribute or has in his possession with intent to sell or distribute or is about to acquire possession with intent to sell or distribute ” any such matter (subd. 1). If an injunction is granted, the statute continues, the resulting order or judgment must direct the defendant to [1] ‘ surrender ’ ’ the offending matter to the sheriff who “ shall be directed to seize and destroy the same ” (subd. 3).
The present suit, instituted by the Corporation Counsel of the City of New York against a number of book sellers Avith premises *180 in that city, concerns a series of paper-hound booklets collectively entitled “ Nights of Horror”. Members of the police force testified at the trial that the booklets had been displayed for sale in defendants’ stores and that they had purchased a number of copies from the various defendants, at prices ranging from $2 to $4 each. The publications themselves were also introduced in evidence. The trial judge, in a carefully considered opinion, found that the booklets were plainly obscene and pornographic, “ dirt for dirt’s sake ”, and held that the statute did not violate any constitutional guarantee. He thereupon granted judgment (1) permanently enjoining defendants from distributing, selling, or acquiring possession of such publications, (2) requiring them forthwith to surrender to the sheriff for destruction all copies in their possession and (3) directing the sheriff to seize and destroy such copies, in the event of defendants’ failure to surrender them. '
The paper-covered booklets before us are indisputably pornographic, indisputably obscene and filthy. Defendants concede as much and also acknowledge, in effect, that, had they been criminally prosecuted for violating the obscenity provisions of the Penal Law, no constitutional argument could successfully have been leveled against resulting convictions. Indeed, not questioning the definiteness of the statutory standard, not challenging the test of obscenity applied by the trial judge, who concluded that the booklets were obscene under any of the judicially announced criteria and not objecting to the failure to require a jury trial,[1] defendants ’ sole attack upon the statute is that the remedy by injunction constitutes an unconstitutional “ prior restraint,” interfering with freedom of speech and press (U. S. Const., 1st and 14th Amendts.; N. Y. Const., art. I, § 8).[2]
*181 There is, of course, no doubt that freedom of speech and press, so basic to a free and dynamic society, extends to all media of expression (see Joseph Burstyn, Inc., v. Wilson, 343 U. S. 495, 501-502; see, also, Chafee on Free Speech in the United States [1941], p. 545), that it protects distribution as well as initial publication (see Lovell v. Griffin, 303 U. S. 444; Grosjean v. American Press Co., 297 U. S. 233) and that it embraces writings or other forms of expression designed for entertainment or amusement, as well as those concerned with the exposition of ideas. (See Winters v. New York, 333 U. S. 507, 510; Hannegan v. Esquire, Inc., 327 U. S. 146, 153.) While the right of free • expression is not absolute or unqualified under all circumstances, it is clear that any invasion of that right must find justification in some overriding public interest, and that restricting legislation must be narrowly drawn to meet an evil which the state has a substantial interest in correcting. (See Joseph Burstyn, Inc., v. Wilson, supra, 343 U. S. 495, 502-504; Feiner v. New York, 340 U. S. 315, 319; Niemotko v. Maryland, 340 U. S. 268, 271-272; Winters v. New York, supra, 333 U. S. 507, 509; Cantwell v. Connecticut, 310 U. S. 296, 307-308; Thornhill v. Alabama, 310 U. S. 88, 97-98, 105.)
That clearly drawn regulatory legislation to protect the public from the evils inherent in the dissemination of obscene matter,[3] at least by the application of criminal sanctions, is not barred by the free speech guarantees of the First Amendment, has been recognized both by this court (see People v. Doubleday & Co., 297 N. Y. 687, affd., by equally divided court, 335 U. S. 848; People v. Wendling, 258 N. Y. 451; People v. Pesky, 254 N. Y. 373; People v. Muller, 96 N. Y. 408) and by the United States Supreme Court. (See United States v. Alpers, 338 U. S. 680; Winters v. New York, supra, 333 U. S. 507, 510, 518, 520; United States v. Limehouse, 285 U. S. 424; see, also, Chaplinsky v. New Hampshire, 315 U. S. 568, 571-572; Near v. Minnesota, 283 U. S. 697, 716; Beauharnais v. Illinois, 343 U. S. 250, 266.) Imprecise though it be — its 1 ‘ vague subject-matter ” being largely *182 ‘ ‘ left to the gradual development of general notions about what is decent ” (per L. Hand, J., United States v. Kennerley, 209 F. 119, 121)—the concept of obscenity has heretofore been accepted as an adequate standard. Indeed, in the Winters case (supra, 333 U. S. 507), the court not only indicated that collocation of the very words found in section 1141 of our Penal Law, “ obscene, lewd, lascivious, filthy, indecent or disgusting ”, is sufficiently ‘ ‘ well understood through long use in the criminal law ’ ’ to satisfy the due process requirements of definiteness and certainty (333 U. S., at p. 518), but actually pointed to the provision as “an example ” of a statute wherein “ apt words ” are used “ to describe the prohibited publications ” (333 U. S., at p. 520).[4]
Thus, by virtue of section 1141, it has long been a misdemeanor in this state, punishable by imprisonment or fine or both, to sell or distribute any written or printed obscene material of the kind described in section 22-a of the Code, and similar statutes are in effect in almost all of the other jurisdictions in this country (see Note, 22 U. of Chicago L. Rev. 216). The legislature, however, apparently concluded that such penal sanctions were inadequate to stem the rising tide of obscene and pornographic publications that have, in recent years, flooded the book and periodical market, and the supplemental remedy of an equity action for an injunction was thereupon devised. (Cf. Report of New York State Joint Legislative Committee to Study the Publication of Comics, N. Y. Legis. Doc., 1954, No. 37, pp. 31-32.) Whether or no the legislature acted wisely is, of course, no concern of the courts. Our inquiry is limited to whether its act transcends constitutional limits.
As already noted, no injunction may issue under section 22-a except after a full trial of the issues, and only upon a finding that the challenged publication is of the same character as would subject the defendant to punishment under the pertinent provisions of the Penal Law. What the statute does is to provide an additional sanction against the dissemination of obscene matter.
*183 It is, however, defendants’ position that the constitution limits the state to the imposition of punishment, and that distribution of the writing itself may not be prevented. An injunction, such as the present one, even though it is issued after publication and after a judicial trial, is characterized as such suppression and censorship as to stamp it an impermissible “ prior restraint.” In other words, it is urged that as long as the publisher or vendor of a writing is willing to risk the imposition of criminal penalties he has an absolute right to proceed with its publication or distribution and any restriction of that right is unwarranted, since, among other things, it would deprive the public of the opportunity of reading and making its own appraisal of the challenged material.
The major, though not exclusive, purpose of the guarantee of free expression is “to prevent previous restraints upon publication.” (Near v. Minnesota, supra, 283 U. S. 697, 713; Joseph Burstyn, Inc., v. Wilson, supra, 343 U. S. 495, 503.) Though difficult of exact formulation (see Emerson, The Doctrine of Prior Restraint, 20 Law and Contemporary Problems 648), this principle of immunity from prior restraint has been applied by the United States Supreme Court in a variety of situations to strike down licensing or censorship systems under which the right of speech, publication or assembly was conditioned upon obtaining the advance approval of an executive board or official vested with broad or undefined discretion. (See, e.g., Poulos v. New Hampshire, 345 U. S. 395; Kunz v. New York, 340 U. S. 290; Niemotko v. Maryland, supra, 340 U. S. 268; Cantwell v. Connecticut, supra, 310 U. S. 296; Schneider v. State, 308 U. S. 147.) As has been pointed out, however, “ the protection even as to previous restraint is not absolutely unlimited ”, although the limitation has been recognized “ only in exceptional cases ”. (Near v. Minnesota, supra, 283 U. S. 697, 716; see, also, Joseph Burstyn, Inc., v. Wilson, supra, 343 U. S. 495, 504.)
The Supreme Court has asserted, by way of dictum, that the control of obscenity presents such an exceptional case. In Near v. Minnesota (supra, 283 U. S. 697, 716), Chief Justice Hughes, in discussing certain extraordinary areas exempt from the sweeping prohibition against prior restraint, stated that one of the exceptions was that ‘ ‘ the primary requirements of decency may be enforced against obscene publications ”, and *184 similar reservations have also been expressed elsewhere. (See Chaplinsky v. New Hampshire, supra, 315 U. S. 568, 571-572; Lovell v. Griffin, supra, 303 U. S. 444, 451; see, also, Chafee, op. cit., p. 10.) But the precise issue whether restraints in advance of publication may be applied to obscene matter has not yet been squarely decided. Questions involving the validity of state systems of censorship of motion pictures have on several recent occasions come before the Supreme Court, hut in each instance the case has been disposed of by striking down some particular standard or criterion on the ground that it did not satisfy the minimum requirements of definiteness and certainty. (See Superior Films v. Department of Educ., 346 U. S. 587; Commercial Pictures Corp. v. Regents, 346 U. S. 587; Joseph Burstyn, Inc., v. Wilson, supra, 343 U. S. 495; Gelling v. Texas, 343 U. S. 960; cf. Holmby Productions v. Vaughn, 350 U. S. 870.) The court has specifically left open the question 5*****11 whether a state may censor motion pictures under a clearly drawn statute designed and applied to prevent the showing of obscene films.” (Joseph Burstyn, Inc., v. Wilson, supra, 343 U. S. 495, 505-506.)[5]
We are not, in my opinion, required in this case to decide categorically the validity, under all circumstances, of any and every prior restraint aimed at obscene matter, regardless of the nature and scope of the regulatory measure employed or of the particular medium of expression involved. While strong objections have been voiced against any practice of general *185 censorship, even in the area of obscenity, and whether administered by an executive agency or a judicial tribunal (see Emerson, supra, 20 Law and Contemporary Problems, at pp. 661, 670-671; Bice, The Supreme Freedom: Three Hundred Years After Milton, pp. 105, 111-112, contained in Great Expressions of Human Bights, edited by B. M. Maclver, published in 1950 by Institute for Beligious and Social Studies: cf. Superior Films v. Department of Educ., supra, 346 U. S 587, 588, per Douglas, J., concurring), that broad question is not here presented. Sharp and precise lines cannot always be drawn between permissible and nonpermissible regulatory measures in the realm of expression. (See Winters v. New York, supra, 333 U. S. 507, 518; Joseph Burstyn, Inc., v. Wilson, supra, 343 U. S. 495, 517-518, per Frankfurter, J., concurring.) Whatever might be said of a scheme of advance censorship directed against all possibly obscene writings, the case before us concerns a regulatory measure of far narrower impact, of a kind neither entailing the grave dangers of general censorship nor productive of the abuses which gave rise to the constitutional guarantees. (Cf. Pound, Equitable Belief Against Defamation and Injuries to Personality, 29 Harv. L. Bev. 640, 650-651.)
There is nothing in section 22-a that constitutes or resembles a system of licensing or other threshhold approval, which would, for example, operate as a pervasive restraint upon all expression relating to sex problems or behavior and which would ban and suppress, without a censor’s imprimatur, any work of literature dealing with those subjects. On the contrary, the statute makes no attempt to subject writings to the scrutiny and screening of a censor prior to publication. The statutory procedures may be invoked only after publication, and no work may be condemned except upon a formal adjudication of obscenity after a trial conducted in accordance with the essential requirements of due process of law. The mind of the trial judge must be satisfied, from a reading of the challenged writing and a consideration of other pertinent evidence, that it is, indeed, of the type and character condemned by the statute. Moreover, his findings are subject to full appellate review on the facts as well as on the law (Civ. Prac. Act, § 584). The procedures thus provided are to be contrasted with the usual features of advance censorship, under which a large measure of discretion is repose*} *186 in the censoring official, the procedural safeguards of judicial proceedings are not available, only limited judicial review is allowed and the burden rests on the publisher or vendor to establish the arbitrariness of an adverse ruling. (See Emerson, supra, 20 Law and Contemporary Problems, at pp. 656-660.)
In point of fact, examination of the operation and effect of section 22-a reveals substantially no greater interference with the freedom of the publisher or vendor than that presented by the possibility of punishment under the Penal Law. There can be little doubt that the rigid enforcement of such penal provisions, though operating by indirection, may serve as effectually as direct action by injunction, if not more so, to deter publication of an obscene work. (See Pound, supra, 29 Harv. L. Rev., at p. 651; Emerson, supra, 20 Law and Contemporary Problems, at p. 660.) In the final analysis, the effectiveness of the injunctive remedy must itself depend upon punitive sanctions, by way of contempt proceedings, for its enforcement; and, if a publisher or vendor would not be deterred by the prospect of prosecution under the Penal Law, he might equally be unaffected by the threat of punishment for contempt. These words are, of course, limited to the statute before us dealing with obscenity, and nothing here written is to be taken as sanctioning the injunctive process in dealing with other objectionable or antisocial material, such as libel.
The reliance which defendants place upon Near v. Minnesota (supra, 283 U. S. 697) is untenable. That case concerned a Minnesota statute which authorized the issuance of an injunction, in a suit to be brought in the name of the state, against the further publication of any newspaper or periodical adjudged to be ‘ ‘ malicious, scandalous and defamatory.[6] Under the statute, any articles deemed to be derogatory to a public officer could be branded ‘ ‘ malicious, scandalous and defamatory ’ ’, if the publisher were unable to establish that they were true and “ published with good motives and for justifiable ends ” (283 U. S., at pp. 709-710). Once such an injunction was issued, resumption of any future printing was banned and punishable as a contempt, unless the publisher was.able to satisfy the court *187 as to the character of the new publication. The court would thus be constituted a censor to pass on the contents of future issues in advance of publication, and whether the publisher [1] ‘ would be permitted again to publish matter deemed to be derogatory to the same or other public officers would depend upon the court’s ruling ” (283 U. S., at p. 712). It was this feature of the law, particularly as applied to newspaper comment upon matters of public importance, upon ideas in the realm of political expression, that was regarded by the Supreme Court as “of the essence of censorship ” and an unwarranted infringement on freedom of discussion (283 U. S., at p. 713).
The features condemned in Near are here absent. The statute now under consideration deals exclusively with matters in the field of lustful emotion. Erotics, not politics, is its subject, and, as already noted, the writings here condemned are unredeemed by even an iota of idea content or of artistic worth. And, unlike the statute in Near which sanctioned a general and future restraint, there is here no restraint of any kind on the publication or distribution of material to be written or produced in the future. The corporation counsel in the court below sought to have the statute read as authorizing an injunction against the sale and distribution, not only of any published work found to be obscene, but also of any future work in the same series. This the trial court very properly refused to do.
In short, careful analysis of the operation and effect of section 22-a, in relation to the basic aims and objectives of the constitutional guarantees, is convincing that the limited injunctive remedy here provided may not be condemned as a forbidden prior restraint. As a matter of fact, analogous decisions under the Federal Tariff Act of 1930 (Act June 17, 1930, ch. 497, tit. Ill, § 305; U. S. Code, tit. 19, § 1305) suggest that a measure which prescribes a penalty only after the challenged work has already been published does not involve any aspect of prior restraint at all. The Tariff Act thus provides for the seizure by the customs collector of any obscene matter imported into this country, and authorizes the United States District Court to direct the forfeiture, confiscation and destruction of such matter upon adjudication after trial that it is obscene. Although the constitutionality of these provisions has apparently never been passed upon by the Supreme Court, the lower federal *188 courts have uniformly either held[7] or assumed[8] the statute to be constitutional. Thus, in United States v. One Obscene Book Entitled “Married Love” (supra, 48 F. 2d 821), Judge Woolsey rejected the contention that the statute impinged on the right of freedom of the press, noting that it did ‘ ‘ not involve the suppression of a book before it is published”; in the course of his opinion, he wrote (p. 822): “ After a book is published, its lot in the world is like that of anything else. It must conform to the law and, if it does not, must be subject to the penalties involved in its failure to do so. Laws which are thus disciplinary of publications, whether involving exclusion from the mails or from this country, do not interfere with freedom of the press.”
It is further urged that even publications adjudged to be obscene cannot constitutionally be withheld from free circulation in the market place of ideas; that, apart from the rights of the publisher and vendor, the public itself has the right to read and examine whatever is published and to form its own opinion of a publication’s value and propriety. But here, as in other situations, the question is one of balancing the several competing interests involved. As the Supreme Court has. emphasized, in reference to the federal statute declaring obscene material non-mailable (35 U. S. Stat. 1129, U. S. Code, tit. 18, former § 334), there is no necessity “ to satisfy all tastes, no matter how perverted.” (Hannegan v. Esquire, Inc., supra, 327 U. S. 146, 158.)
In reaching the conclusion which I do, I assume, of course, that the statutory proscription of obscenity will be applied with great care and selectivity so as not to interfere with the circulation of legitimate works of literature; that the libidinous character of a challenged work will be determined by viewing it “ broadly as a whole ” (Halsey v. New York Soc. for Suppression of Vice, 234 N. Y. 1, 4-5), with reference to “ its dominant effect “ not on any particular class, but upon all those whom it is likely to reach ” (United States v. Levine, 83 F. 2d 156, 157; United States v. One Book Called Ulysses, supra, 72 F. 2d 705, 707-708, affg. 5 F. Supp. 182); and that consideration will be given, among other factors, to “ the established reputation of *189 the work in the estimation of approved critics, if the book is modern, and the verdict of the past, if it is ancient (United States v. One Book Called Ulysses, supra, 72 F. 2d 705, 708.) The danger of arbitrary or erroneous decision under the statute is minimized by the availability of appellate review of the trial court’s findings of fact. The same danger is presented in criminal prosecutions for obscenity, and the remedy lies, not in preventing the state from more effectually enforcing its policy against the circulation of the obscene, but in making certain that the courts apply standards that will insure the least possible risk of interference with unobjectionable publications.
The judgment appealed from should be affirmed, with costs.
Desmond, J.
Defendants expressly admit the (obvious) fact that the books which they sold, and the further sale of which has been here enjoined, are obscene. They thus concede that the books are such as are subject under section 22-a of the New York Code of Criminal Procedure to an injunction at the suit of the corporation counsel who brought this action. Those concessions leave defendants with one possible ground for appeal and that ground they take. Their sole assertion in this court is that section 22-a is unconstitutional because, say defendants, any and every prior restraint on the publication or sale of obscene literature violates the First Amendment. Since no other question is presented, we must limit ourselves to answering that question. It detracts nothing from Judge Fuld’s fine opinion to point out that its discussion of many other questions not before us on this appeal is not binding on this court.
Answering the one argument made to us, we hold on most ample authority that the First Amendment does not protect obscene books against prior restraint (Chaplinsky v. New Hampshire, 315 U. S. 568, 572; Near v. Minnesota, 283 U. S. 697, 716; Joseph Burstyn, Inc., v. Wilson, 343 U. S. 495, 502-504; see Beauharnais v. Illinois, 343 U. S. 250, 266; Ex Parte Jackson, 96 U. S. 727, and Hannegan v. Esquire, Inc., 327 U. S. 146). The standard set up by section 22-a, “ obscene, lewd, lascivious, indecent or disgusting ”, is a valid and adequate one (Winters v. New York, 333 U. S. 507, 518; see Rosen v. United States, 161 U. S. 29, 42; Swearingen v. United States, 161 U. S. 446, 451; Robertson v. Baldwin, 165 U. S. 275, 281; U. S. Code, tit. 18, § 1461; United States v. Limehouse, 285 U. S. 424; Hannegan v. Esquire, Inc., 327 U. S. 146, 156, 158, supra; Times Film Corp. *190 v. City of Chicago, 139 F. Supp. 837; People v. Muller, 96 N. Y. 408; People v. Doubleday & Co., 297 N. Y. 687, affd. by equal vote 335 U. S. 848; Commonwealth v. Holmes, 17 Mass. 335).
No one claims that section 22-a lacks appropriate procedural protections for those sued under it.
The judgment should be affirmed, with costs.
Dye and Van Voobhis, JJ., concur in opinion of Fuld, J.; Cowway, Ch. J., and Feoessel, J., concur in opinion of Desmond, J.; Bubke, J., taking no part.
Judgment affirmed.

. It may be well to note that in a criminal prosecution based upon section 1141 of the Penal Law, involving as it does a misdemeanor charge, the defendant is not entitled to a trial by jury as a matter of constitutional right. (N. Y. Const., art. VI, § 18; see People v. Kaminsky, 208 N. Y. 389, 394; People ex rel. Cosgriff v. Craig, 195 N. Y. 190, 195-196; see, also, N. Y. City Crim. Cts. Act, § 31, subd. 1, pars, [b], [e].)

. We do not concern ourselves with the further provision of the statute directing the court to render its decision “within two days of the conclusion of the trial” (subd. 2), in view of the fact that the parties agreed neither to invoke nor insist upon that requirement.

. It is noteworthy that studies are for the first time being made, through such scientific skills as exist, concerning the impact of the obscene, in writings and other mass media, on the mind and behavior of men, women and children. (See, e.g., Jahoda and Staff of Research Center for Human Relations, New York University [1954], The Impact of Literature: A Psychological Discussion of Some Assumptions in the Censorship Debate.)

. Application of the standard may, perhaps, raise constitutional questions in individual cases (cf. Doubleday & Co. v. New York, 335 U. S. 848, affg., by equally divided court, 297 N. Y. 687, supra; Roth v. Goldman, 172 F. 2d 788, 792, per Frank, C. J., concurring; see Lockhart & McClure, Literature, The Law of Obscenity and the Constitution, 38 Minn. L. Rev. 295), but the present is not such a case.

. I do not believe that Holmby Productions (supra, 350 U. S. 870) answers this question. The Kansas statute there considered provided for the banning of any motion picture found by the state’s board of review to be “ obscene, indecent or immoral, or such as tend to debase or corrupt morals ”. The film, “ The Moon is Blue ”, while labeled by the board as “ obscene,” as well as “ indecent and immoral,” was specifically condemned for the following stated reason: “ Sex theme throughout, too frank bedroom dialogue; many sexy words; both dialogue and action have sex as their theme.” The Supreme Court reversed the judgment of the Kansas high court which had accepted. the board’s interpretation of the statute as well as its determination (177 Kan. 728). It is our surmise that this decision of the Supreme Court — reflected in a Per Curiam, merely citing Burstyn (supra, 343 U. S. 495) and Superior Films (supra, 346 U. S. 587) —turned solely on the wide reach and the essential vagueness of the standard employed by the Kansas court. Since any film could apparently be banned as “ obscene, indecent or immoral ” if a sex theme predominated, the term “ obscene ” was no narrower, no more definite or certain, than the criteria previously stricken as too vague in the Commercial Pictures and Superior Films cases (supra, 346 U. S. 587).

. The same statute also authorized an injunction against the further publication of any newspaper or periodical adjudged to be “ obscene, lewd and lascivious ”, but that portion of the statute was not involved in the ease,

. See Besig v. United States (208 F. 2d 142); United States v. One Obscene Book Entitled ‘‘Married Love” (48 F. 2d 821, 822).

. See Parmelee v. United States (113 F. 2d 729); United States v. One Book Called Ulysses (72 F. 2d 705); United States v. One Unbound Volume of Prints (128 F. Sapp. 280).